## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49245-8-II |
| Respondent, | |
| v. | |
| DANIEL GALEANA RAMIREZ, | PUBLISHED IN PART OPINION |
| Appellant. | |

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49278-4-II |
| Respondent, | |
| v. | |
| ALEJANDRO RAMIREZ, | |
| Appellant. | |

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49265-2-II |
| Respondent, | |
| v. | |
| STEVEN NICOLAS RUSSELL, | |
| Appellant. | |

SUTTON, J. — Daniel Galeana Ramirez (Galeana Ramirez), Alejandro Ramirez (Ramirez),

and Steven Nicolas Russell (Russell) appeal their multiple convictions.  They argue that the trial

court violated their right of confrontation by not allowing them to confront the technician who extracted the data from Russell's cell phone found at the scene of one of the incidents that led to a conviction. In the published portion of the opinion, we hold that the confrontation clause did not require testimony from the technician because he was not a "witness against" the appellants. In the unpublished portion of the opinion, we reject all additional arguments except for Russell's claim that his judgment and sentence contains a scrivener's error. Accordingly, we affirm the appellants' convictions, but we remand to correct the scrivener's error in Russell's judgment and sentence.[1]

## FACTS

### I. BACKGROUND

This case arises out of two related incidents that occurred during the night of October 24 and the early morning of October 25 in 2015.

Jose Leiva-Aldana and Augustin Morales-Gamez were walking home on the night of October 24, when they are accosted by two men. The men demanded money, tried to take Leiva-Aldana's wallet and took Morales-Gamez's cell phone. The men, later identified as Ramirez and Russell, physically assaulted Leiva-Aldana and Morales-Gamez; during the assault, Morales-Gamez was hit in the head with a hard metal object. Morales-Gamez fought back with a small knife and the attackers fled. Leiva-Aldana and Morales-Gamez reported the incident to the police.

---

[1] The appellants also request that we not impose appellate costs due to their indigency. Because the State has not yet requested costs, we decline to decide this issue. If the State elects to file a cost bill and the appellants object, a commissioner of this court will consider the request under RAP 14.2.

After reporting the incident to police, Leiva-Aldana and Morales-Gamez walked home in the early morning hours of October 25. As they approached their home, they were again accosted and assaulted by two men, later identified as Russell and Galeana Ramirez. During this second assault, the attackers shot Leiva-Aldana in the stomach and shrapnel from a bullet hit Morales-Gamez in the foot.

Officers discovered a cell phone at the scene of the October 24 robbery incident. Detective Dave Cox sent the cell phone to the Computer Crime Institute at Dixie State University in order for them to perform a "chip-off" procedure. Verbatim Report of Proceedings (VRP) (June 30, 2016) at 19. Chip-off forensics is a high-tech method of extracting and analyzing data stored on flash memory chips. This method often allows the extraction of data from devices even if the device is damaged or the data has been deleted. *See* VRP (June 30, 2016) at 26. Detective Cox later received the cell phone back with hundreds of pages of data extracted from the cell phone.

## II. PROCEDURE

### A. CHARGES

Based solely on the October 24 incident, the State charged Russell with first degree robbery of Morales-Gamez (count I), attempted first degree robbery of Leiva-Aldana (count II), fourth degree assault of Morales-Gamez (count V), and fourth degree assault of Leiva-Aldana (count VI). Based on the October 25 incident, the State charged Russell with first degree assault of Leiva-Aldana (count III) and first degree assault of Morales-Gamez (count IV). The first degree robbery, attempted first degree robbery, and the two first degree assaults included firearm sentencing enhancements.

3

Based solely on the October 24 incident, the State charged Ramirez with first degree robbery of Morales-Gamez (count I), attempted first degree robbery of Leiva-Aldana (count II); fourth degree assault of Morales-Gamez (count III), and fourth degree assault of Leiva-Aldana (count IV). Based solely on the October 25 incident, the State charged Galeana Ramirez with first degree assault of Leiva-Aldana (count 1) and first degree assault of Morales-Gamez (count II).

B. PRETRIAL MOTION TO ADMIT CELL PHONE TESTING RESULTS

Before trial, the parties learned that William Matthews, the technician who performed the chip-off data extraction from the cell phone found at the scene of the robbery, could not be located for trial. The State sought to admit the data extraction results by laying a foundation with Joan Runs Through, the assistant director of the Computer Crime Institute.

At the hearing on this matter, Runs Through admitted that she did not extract the data and that her testimony relied entirely on the report of testing done by Matthews. Runs Through testified generally about the type of data Matthews could have extracted from the cell phone, which included text and short message service messages, pictures, internet activity, and calendar information. Runs through also testified that she was familiar with the chip-off process and that she had taught the process to other technicians at the university. Specifically, she testified that there is nothing that the technician or an examiner can do to change data on the chip. Runs Through further testified that she looked through the extracted cell phone information and that the process had worked correctly.

4

Defense counsel objected to Runs Through's testimony and argued that the cell phone evidence should be excluded unless Matthews testified. The trial court disagreed and ruled that Runs Through could testify about the chip-off process.

C. TRIAL TESTIMONY—CELL PHONE

At trial, Runs Through testified extensively about the chip-off process and the preparation of the resulting report. She did not testify about the content of the cell phone found at the scene of the robbery. The trial court admitted portions of the report. Based on the report exhibits, Detective Cox testified about the data extracted from the phone that allowed him to connect the cell phone with Russell and then to connect Russell to Ramirez. Detective Cox also testified that the data extracted from the cell phone included text messages from Russell to Ramirez inviting Ramirez to go out for a beer at 7:00 PM on the night of October 24.

A jury convicted Russell, Ramirez, and Galeana Ramirez as charged. Russell, Ramirez, and Galeana Ramirez appeal their convictions, and Russell appeals an error in his judgment and sentence.[2]

ANALYSIS

The appellants argue that the trial court violated their rights of confrontation when it admitted the cell phone data extraction report when they had no opportunity to cross-examine Matthews. The appellants contend that allowing them to question Runs Through as a surrogate witness for Matthews was not sufficient to protect their rights to confrontation because Runs

---

[2] We set out additional facts related to the issues raised in the unpublished portion of this opinion below.

Through was not involved in the testing. We hold that because the cell phone data extraction report did not inculpate the appellants, Matthews was not a "witness against" the appellants, and their confrontation rights were not implicated.

A. LEGAL PRINCIPLES

A criminal defendant has the right to confront "the witnesses against him." U.S. CONST. amend. VI; WASH. CONST. art. I, § 22 (confrontation clause). The confrontation clause applies when a witness is unavailable at trial. *State v. Price*, 158 Wn.2d 630, 639, 146 P.3d 1183 (2006). We review confrontation clause claims de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

We apply a two-part test to determine whether the lack of testimony from a witness who assisted in the preparation of forensic evidence testing implicates the confrontation clause. *State v. Lui*, 179 Wn.2d 457, 470-71, 315 P.3d 493 (2014). In *Lui*, our Supreme Court held that an expert's testimony comes within the scope of the confrontation clause only if (1) the person is a "'witness' by virtue of making a statement of fact to the tribunal" and (2) the person is a witness "'against' the defendant by making a statement that tends to inculpate the accused." 179 Wn.2d at 462. A "witness" is one who attests to facts; "against" indicates that those facts are adversarial in nature. *Lui*, 179 Wn.2d at 480. This two-part test "allows expert witnesses to rely on technical data prepared by others when reaching *their own conclusions*, without requiring each laboratory technician to take the witness stand." *Lui*, 179 Wn.2d at 483 (emphasis added).

To be a "witness" for the purpose of the confrontation clause, the expert must impart factual information to the court. *Lui*, 179 Wn.2d at 480. "This definition does not sweep in analysts

whose only role is to operate a machine or add a reagent to a mixture." *Lui*, 179 Wn.2d at 480.

"[M]erely laying hands on evidence . . . does not a 'witness' make." *Lui*, 179 Wn.2d at 481.

Even if a witness imparts facts to the court, the witness is not a witness "against" the defendant unless those facts are adversarial in nature and have "some capacity to inculpate the defendant." *Lui*, 179 Wn.2d at 480-81. In *Lui*, our Supreme Court held that an expert was a witness when she ran a test and created a deoxyribonucleic acid (DNA) profile but that the expert only became a witness *against* the defendant once she compared the test DNA profile to the defendant's DNA profile. *Lui*, 179 Wn.2d at 488-89. The necessary inculpatory element was present only at the comparison stage because the data that the expert used did not itself inculpate anyone and did not have any meaning to a nonexpert. *Lui*, 179 Wn.2d at 488.

B. WITNESS

As in *Lui*, there is no question that Russell and Ramirez "confronted the State's witnesses 'face to face.'" 179 Wn.2d at 469. The question here "is whether the State presented the *correct* witness." *Lui*, 179 Wn.2d at 469. To answer this question, we must address whether Matthews was a "witness" for purposes of the confrontation clause. Russell and Ramirez argue that Matthews was a "witness" because Matthew's report is a statement of fact to the tribunal. We agree.

In *Lui*, our Supreme Court concluded that a doctor who took a murder victim's body temperature readings was "a 'witness' by virtue of recording the temperatures, thus creating factual information for later use by the court." 179 Wn.2d at 493. Similarly, here Matthews ran a test that created factual information for later use by the court. And, although he did not testify, his

7

report was used as the basis for two other witnesses' testimony, Runs Through and Detective Cox. Thus, we hold that Matthews was a "witness" in this case.

C.  WITNESS AGAINST A DEFENDANT

We next determine whether Matthews was a witness *against* Russell and Ramirez.  To make this determination, we examine whether Matthews's cell phone data extraction report was inculpatory.  *Lui*, 179 Wn.2d at 462.

In *Lui*, our Supreme Court held that the raw data of the DNA test was not inculpatory because the data that the testifying expert used did not have any meaning to a nonexpert.  *Lui*, 179 Wn.2d at 488.  "The necessary inculpatory element" did not arise until an expert compared the DNA profiles and gave meaning to the data.  *Lui*, 179 Wn.2d at 488.  The facts are similar here.

Here, Matthews performed the chip-off and ran a program that extracted the cell phone data from the chip recovered from the cell phone found at the scene of the robbery.  Although the report contained data such as email addresses, text communications, and Galeana Ramirez's contact information, and likely had more meaning to a nonexpert than raw DNA data, the key inculpatory aspect of the data here was the connection between Russell and Ramirez on October 24.  The connection between Russell and Ramirez on October 24 was explained during Detective Cox's testimony, not by the report itself.  Matthews merely ran a program that extracted data from the chip.

This case is similar to *Lui* in that the person who ran the test made no comparison or conclusions from the extraction of the data.  Therefore, we hold that Matthews's cell phone data extraction report was not inculpatory or testimonial and the report did not implicate Russell and

Ramirez's confrontation rights; thus, the trial court did not violate Russell's and Ramirez's confrontation rights by not requiring Matthews to testify.

Accordingly, we affirm the appellants' convictions. But, as discussed in the unpublished portion of this opinion, we remand to correct the scrivener's error in Russell's judgment and sentence.

A majority of the panel having determined that only the foregoing portion of the opinion will be printed in the Washington Appellate Reporters and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is ordered.

In the unpublished portion of the opinion, we hold that (1) the trial court's decision to join and consolidate the appellants' jury trials, and not to sever them, was not an abuse of discretion; (2) the appellants' rights to unanimous verdicts were not violated; (3) the appellants' waived the argument that an officer gave an improper opinion testimony on guilt; (4) the appellants' ineffective assistance claim fails because counsel was not deficient; (5) neither Russell's nor Ramirez's separate convictions for fourth degree assault merge with their separate convictions for first degree robbery and attempted first degree robbery; and (6) Russell's judgment and sentence contains a scrivener's error regarding the firearms enhancement. Additionally, the appellants' statements of additional grounds (SAG)[3] and cumulative error claims also fail.

---

[3] RAP 10.10.

ADDITIONAL FACTS

I.  JOINDER, SEVERANCE, AND TRANSPORTATION ISSUE

Before trial, the State moved to join Russell's, Ramirez's, and Galeana Ramirez's cases. The trial court granted the motion and ordered the cases joined for trial over defense counsels' objections. Subsequently, each appellant filed motions to sever which the trial court denied.

Prior to voir dire, Galeana Ramirez's counsel expressed concern about how the defendants were being brought into the courtroom. Counsel stated that while the defendants were obviously in custody and being guarded by jail staff, they were brought down a hallway past the room where jurors were sitting. The trial court responded that counsel could ask about this during voir dire and declined the request to start the trial on another day. Despite the trial court's invitation, none of the defense counsel questioned the jury panel about this issue.

II.  TRIAL TESTIMONY—OCTOBER 24 INCIDENT

A.  OCTOBER 24 INCIDENT

At trial, the jury heard the following evidence related to the October 24 incident.

On October 24, 2015, Morales-Gamez and Leiva-Aldana were walking home when they were attacked from behind in an alley near their home.[4] The event was captured by nearly video cameras.

Morales-Gamez testified that when the men attacked them "they were yelling and they wanted [Morales-Gamez and Leiva-Aldana] to give them the wallet, [their] money." VRP (June

_____

[4] Although Morales-Gamez and Leiva-Aldana testified that they were attacked by four men, the video of the attack shows only two attackers. Two witnesses, Nichole Smith and Aaron Johnson, also testified that there were only two attackers.

29, 2016) at 92. The men hit Morales-Gamez in the head with something metal and he fell to the ground. Morales-Gamez also testified that the men took his cell phone. Morales-Gamez defended himself with a knife during the incident. After the attack, Morales-Gamez asked a nearby woman who witnessed the incident to call the police.

Leiva-Aldana also testified that he and Morales-Gamez were "jumped" in the alley. VRP (June 30, 2016) at 94. He testified that the assailants "threw [them] down" and "beat [them] up" using their feet and fists. VRP (June 30, 2016) at 94-95. Leiva-Aldana stated that the assailants demanded his and Morales-Gamez's money and attempted to get into his and Morales-Gamez's pockets to take their wallets. Leiva-Aldana further testified that the attackers were armed with "something black, like a weapon." VRP (June 30, 2016) at 95. Specifically, Leiva-Aldana described the object as a type of "arm" and said that the two men hit Morales-Gamez with it. VRP (June 30, 2016) at 96. Leiva-Aldana also stated that Morales-Gamez struck the attackers with a knife. Leiva-Aldana testified that the fight was "really fast" and estimated it lasted "like five minutes." VRP (June 30, 2016) at 96. On cross-examination, Leiva-Aldana admitted that he could see something in the attacker's hand, but he could not confirm that it was a gun.

The video recording of the attack was played at trial. The video showed two men run up to and accost Morales-Gamez and Leiva-Aldana. During the fight, which was illuminated by a spotlight, two other individuals, later identified as Nichole Smith and Aaron Johnson, are seen coming into the alley to watch the assault. The duration of the fight on the video was approximately two minutes. The police arrived about five minutes later.

11

Smith testified that she and Johnson heard yelling and came outside to see two men "beating up" the victims. VRP (June 29, 2016) at 18. She observed the assailants "punching and kicking at [the victims] and grabbing stuff from their pockets." VRP (June 29, 2016) at 19. She estimated that this went on for "about 10 minutes" before the assailants noticed they were being watched and fled.[5] VRP (June 29, 2016) at 19. After the assailants fled, the victims asked Smith to call the police. Smith also testified that the victims kept saying "pistol." VRP (June 29, 2016) at 20. Smith identified Russell as one of the assailants from a photo lineup and also identified him at trial. Smith testified that she could not identify the other assailant, but she stated that he wore a black oversized hoodie.

Johnson testified that he and Smith went outside after hearing screaming and yelling outside their kitchen window. When they came outside, Johnson saw two men hitting Morales-Gamez and Leiva-Aldana, who were on the ground. Johnson testified that the assailants were hitting the victims with "full fist[s]" and kicking them. VRP (June 29, 2016) at 48. Johnson stated that the fight lasted two to three minutes. Johnson also identified Russell in a photo lineup and identified him at trial. Johnson corroborated Smith's testimony that the other assailant was wearing a black oversized hoodie.

Detective Jason Perkinson testified that on October 24, he was working security at Grays Harbor Community Hospital. While working, he saw two men, later identified as Russell and

---

[5] Smith later testified that she estimated she was in the alley for five to ten minutes. It is unclear if that time period included the time it took the police to respond.

Ramirez, come into the emergency room.  Detective Perkinson later found out that the two men were at the hospital because Ramirez had been stabbed.

Detective Perkinson observed that Ramirez had been wearing a black sweatshirt when he arrived at the hospital.  When Detective Perkinson attempted to contact Russell and Ramirez at the hospital, Russell had already left.  Soon afterwards, Russell returned to the hospital with Galeana Ramirez and went to Ramirez's room. Around 2:00 AM, Russell and Galeana Ramirez left the hospital.

Sergeant Casey Wagonblast testified that he seized a black hoodie sweatshirt from Ramirez's hospital room.  Sergeant Wagonblast described the sweatshirt as an extra-large size and testified that the sweatshirt appeared to be too large for Ramirez.  The sweatshirt also had a hole in it and a bloodstain on it.

B.  TRIAL TESTIMONY—OCTOBER 25 INCIDENT

The jury also heard the following testimony related to the October 25 incident.

Morales-Gamez testified that after the initial attack near their home, he and Leiva-Aldana went to the police station to give statements about the incident.  Leiva-Aldana and Morales-Gamez left the police station around 2:00 AM on October 25.  Morales-Gamez testified that as he and Leiva-Aldana again approached their home, two men, later identified as Russell and Galeana Ramirez, were waiting for them and that one of them shot Leiva-Aldana.  Morales-Gamez testified that some shrapnel also hit him in the foot.

Leiva-Aldana testified that during the second confrontation, Galeana Ramirez shot him "in the stomach."  VRP (June 30, 2016) at 102-04.  Leiva-Aldana was taken to the hospital for his

gunshot wound. Leiva-Aldana also testified that he was familiar with Galeana Ramirez because he knew Galeana Ramirez's family.

Detective Cox testified that when he arrived at the hospital on October 25 at 8:30 AM, Leiva-Aldana was still in the hospital. Detective Cox showed Leiva-Aldana a series of photographs and Leiva-Aldana identified Galeana Ramirez as the person who shot him.

Officer Monte Glaser testified that Leiva-Aldana suffered a "though and through [gunshot] wound" to his upper left abdomen. VRP (July 1, 2016) at 228.

### III. JURY VERDICTS AND SENTENCING

The jury found Ramirez guilty of first degree robbery, attempted first degree robbery, and two counts of fourth degree assault. The jury found Galeana Ramirez guilty of two counts of first degree assault.

The jury also found Russell guilty of first degree robbery, attempted first degree robbery, two counts of fourth degree assault, and two counts of first degree assault. By special verdict, the jury declined to find that Russell or an accomplice had committed either the robbery (count I) or the attempted robbery (count II) while armed with a firearm. But the jury found that Russell or an accomplice had committed the two counts of first degree assault (counts III and IV) while armed with a firearm.

The trial court incorrectly noted in Russell's judgment and sentence that the jury had found that Russell had "used a firearm in the commission of" the robbery (count I) and the attempted robbery (count II). Suppl. CP at 185 (emphasis omitted). Despite this error, the judgment and

14

sentence correctly imposed the 60 month firearm enhancements on the two first degree assault

convictions (counts III and IV).

Russell, Ramirez, and Galeana Ramirez appeal their convictions. Russell also appeals a

scrivener's error in his judgment and sentence.

ADDITIONAL ANALYSIS

I. JOINDER OF DEFENDANTS AND DENIAL OF SEVERANCE

The appellants next argue that the trial court's decisions to grant the State's motion for

joinder of defendants and to consolidate the cases for trial and then later to deny the codefendants'

motion to sever their trials was prejudicial error.[6] We disagree.

A. LEGAL PRINCIPLES

Separate trials are not favored in Washington. *State v. Asaeli*, 150 Wn. App. 543, 583, 208

P.3d 1136 (2009). A trial court may join two or more defendants for trial

> [w]hen, even if conspiracy is not charged and all of the defendants are not charged
> in each count, it is alleged that the several offenses charged:
>> (i) were part of a common scheme or plan; or
>> (ii) were so closely connected in respect to time, place and occasion that it
> would be difficult to separate proof of one charge from proof of the others.

CrR 4.3(b)(3). "[D]efendants properly joined under rule 4.3 shall be consolidated for trial unless

the court orders severance pursuant to rule 4.4." CrR 4.3.1. The trial court should grant severance

of defendants when "it is deemed necessary to achieve a fair determination of the guilt or innocence

of a defendant." CrR 4.4(c)(2)(ii).

---

[6] Ramirez makes this argument in his brief and Galeana Ramirez adopts this argument. Russell
also adopts this argument. Galeana Ramirez also repeats the joinder argument in his SAG.

We review a trial court's pretrial joinder decisions and subsequent decisions on motions for severance for an abuse of discretion. *See State v. Bluford*, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017),[7] *State v. Rodriguez*, 163 Wn. App. 215, 228, 259 P.3d 1145 (2011); *State v. Wood*, 94 Wn. App. 636, 641, 972 P.2d 552 (1999). A trial court abuses it discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State v. Barry*, 184 Wn. App. 790, 802, 339 P.3d 200 (2014).

"[J]oinder should not be allowed . . . if it will clearly cause undue prejudice to the defendant." *Bulford*, 188 Wn.2d at 307. Similarly, "'[d]efendants seeking severance have the burden of demonstrating that a joined trial would be so manifestly prejudicial as to outweigh the concern for judicial economy.'" *State v. Moses*, 193 Wn. App. 341, 359, 372 P.3d 147, *review denied*, 186 Wn.2d 1007 (2016) (quoting *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)).

To determine if joinder caused undue prejudice, we examine (1) the strength of the State's evidence as to each defendant, (2) the clarity of the defendants' defenses, (3) the trial court's instructions directing the jury to consider each count separately, and (4) the admissibility of the evidence against the other defendants even if not joined for trial. *See Bulford*, 188 Wn.2d at 311-12; *see also State v. Redd*, 51 Wn. App. 597, 603-04, 754 P.2d 1041 (1988). "[W]here the likely prejudice to the defendant will not necessary prevent a fair trial, 'the court must weigh prejudice to the defendant caused by the joinder against the obviously important considerations of economy

---

[7] Although *Bluford* addressed joinder of charges under CrR 4.3(a), not joinder of defendants under CrR 4.3(b), we cite to *Bluford* for the general principles of law that apply to joinder generally.

and expedition in judicial administration.'" *Bluford*, 188 w21 at 311 (quoting *State v. Smith*, 74

Wn.2d 744, 755, 446 P.2d 571 (1969)).

To demonstrate that the trial court abused its discretion when it denied the motions to sever,

the appellants "'must be able to point to specific prejudice' to support a claim that the trial court

abused its discretion." *Moses*, 193 Wn. App. at 359 (quoting *Wood*, 94 Wn. App. at 641). To

determine whether the appellants have shown specific prejudice in the severance context, we apply

a test similar to the test applied in the joinder context. In the severance context,

[s]pecific prejudice may be demonstrated by showing:

"(1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a co-defendant's statement inculpating the moving defendant; (4) or gross disparity in the weight of the evidence against the defendants."

*Moses*, 193 Wn. App. at 360 (internal quotation marks omitted) (quoting *State v. Canedo-Astorga*,

79 Wn. App. 518, 528, 903 P.2d 500 (1995).

B. RAMIREZ

Ramirez argues that "[t]he central dispute in [his] case turns on the disparity of strength of

the State's evidence in Ramirez's compared with Russell and Galeana Ramirez, whether the

evidence was cross admissible, and whether the jury could be expected to compartmentalize the

evidence." Br. of Appellant Ramirez at 35. We disagree.

1. Joinder

We first address whether the trial court erred when it joined Ramirez's case with Russell's

and Galeana Ramirez's cases. We hold that the trial court did not err.

17

Although there was no direct identification of Ramirez as one of the people involved in the initial assaults, there was strong circumstantial evidence of Ramirez's involvement in the initial assaults. Specifically, (1) the assailant's clothing and Ramirez's clothing when he arrived at the hospital were similar, (2) the assailant was stabbed during the altercation and Ramirez arrived at the hospital with a stab wound immediately following the first incident, (3) Russell, who was directly identified as having been involved in the first incident, accompanied Ramirez to the hospital, and (4) Galeana Ramirez, who was directly identified as having been involved in the second incident, visited Ramirez immediately before the second incident. Despite the lack of a direct identification, this evidence was strong enough that the trial court could conclude the evidence of Ramirez's involvement in the first incident was not significantly weaker than the evidence of Russell's involvement, who was directly identified by eyewitnesses Smith and Johnson.

As to whether the evidence was cross-admissible in relation to Russell and Galeana Ramirez, we note that "[t]he mere fact that evidence is not cross admissible does not automatically preclude joinder." *Bluford*, 188 Wn.2d at 315. Although evidence relevant to only the second incident would arguably not have been admissible against Ramirez if he had been tried separately from Russell and Galeana Ramirez, Ramirez was not charged with any offenses related to the second incident. And the evidence clearly established that Ramirez was in the hospital when the second incident occurred. Thus, evidence that would have been inadmissible if Ramirez would have been tried separately was not prejudicial to Ramirez.

As to whether the jury would be capable of compartmentalizing the evidence relevant to Ramirez's charges and the evidence that was not relevant to Ramirez's charges, the trial court could have easily concluded that compartmentalization would not be a problem. Ramirez was not charged with any crimes related to the second incident and the two incidents were clearly distinct. The evidence also made it quite clear that Ramirez was not involved in any offenses based on the second incident because he was still in the hospital when the shootings occurred.

Additionally, although Ramirez does not address these factors, the individual defenses of identity and general denial were clear, and the trial court instructed the jury to "decide each count charged against each defendant" separately. Ramirez CP at 73 (jury instruction 4). Thus, Ramirez has not established that there was sufficient prejudice that he would not have received a fair trial unless he was tried separately from Galeana Ramirez and Russell.

Given the likelihood that Ramirez would not have been significantly prejudiced by the joint trials, we must now weigh the potential prejudice with the benefit of judicial economy. Here, although Ramirez was not involved in the second incident, the evidence of the first incident was relevant to the second incident. Specifically, the fact that Ramirez was stabbed during the first incident provided the motivation for the second incident and explained why Russell was involved in both incidents. Joining cases and allowing the State to present the facts related to both incidents in one trial was clearly in the interest of judicial economy. Because it is unlikely Ramirez was prejudiced by the joint trials, the trial court did not err in concluding that the balance weighed in favor of joint trials.

2. Severance

We next address whether the trial court erred when it refused to sever Ramirez's case from Russell's and Galeana Ramirez's cases. We hold that it did not.

First, all three asserted defenses of identity and general denial. These defenses were not antagonistic defenses.

Second, the case was not so complex that it was impossible for the jury to separate the evidence as to each appellant. Although there were two incidents involved and not every appellant was involved in every offense, the evidence relating to each appellant was clear and the charges further clarified which defendant was alleged to have been involved in which offense.

Third, Ramirez does not assert, nor can we discern, any statements by Russell or Galeana Ramirez that implicated Ramirez. And fourth, as discussed in the previous section, although the evidence against Ramirez was more circumstantial than the evidence against the others, this did not amount to a gross disparity in the weight of evidence because the circumstantial evidence connecting Ramirez to the first incident was strong.

Thus, Ramirez fails to establish that the trial court's refusal to sever Ramirez's case from his co-defendant's cases resulted in specific prejudice. Accordingly, the trial court did not err when it denied his motion to sever.

C. GALEANA RAMIREZ

In his SAG, Galeana Ramirez argues that the trial erred when it joined his case with Ramirez's and Russell's cases. Galeana Ramirez has also joined in all of Ramirez's arguments.

1. Joinder

We first address whether the trial court erred in joining Galeana Ramirez's case to Russell's and Ramirez's cases. We hold that the trial court did not err.

As to the strength of the State's evidence related to Galeana Ramirez, the evidence that Galeana Ramirez had been involved in the second incident was quite strong because Leiva-Aldana knew Galeana Ramirez and identified him as the shooter. As discussed above, the defenses for each appellant were clear and the jury was instructed to consider each count separately.

As to the admissibility of the evidence of the other charges, even if Galeana Ramirez's case had not been joined with Ramirez's and Russell's, although the evidence related to the first incident may not have been cross admissible as to Galeana Ramirez, it is unlikely that the admission of this evidence was prejudicial because Galeana Ramirez was not charged with any crimes related to the first incident. Thus, Galeana Ramirez does not show that the joinder of his case with Russell's and Ramirez's cases would have deprived him of a fair trial and any potential prejudice was likely outweighed by the judicial economy of having to present the same evidence at different trials if he had been tried separately.

2. Severance

We next address whether the trial court erred when it refused to sever Galeana Ramirez's case from Russell's and Ramirez's cases. We hold that the trial court did not err.

As with Ramirez, the defenses were not antagonistic defenses and the cases were not so complex that it was impossible for the jury to separate the evidence as to each co-defendant. Galeana Ramirez does not assert, nor can we discern, any statements by Russell or Ramirez that

implicated Galeana Ramirez. And, as previously discussed, the evidence against Galeana Ramirez was strong because he was identified by one of the victims as the shooter in the second incident.

Thus, Galeana Ramirez fails to establish that the trial court's refusal to sever Galeana Ramirez's case from Russell's and Ramirez's cases resulted in specific prejudice. Accordingly, the trial court did not err when it denied his motion to sever.

D.  RUSSELL

Russell has adopted Ramirez's and Galeana Ramirez's arguments by reference.

1.  Joinder

We first address whether the trial court erred in joining Russell's case to Galeana Ramirez's and Ramirez's cases. We hold that the trial court did not err.

As to the strength of the State's evidence related to Russell, the evidence that he was involved in the first incident was strong because he was identified by eyewitnesses Smith and Johnson, and Russell's cell phone was found at the scene of the initial assaults. And in relation to the second incident, there was evidence that Russell had contacted Galeana Ramirez and had left the hospital with Galeana Ramirez shortly before the shootings.

As discussed above, the defenses were clear and the jury was instructed to consider each count separately. And as to the cross admissibility of the evidence, Russell was involved in both incidents, so it is not likely there was much evidence that would not have been cross admissible. Thus, Russell does not show that the joinder of his case with Galeana Ramirez's and Ramirez's cases would have deprived him of a fair trial and any potential prejudice was likely outweighed by

the judicial economy of having to present the same evidence at different trials if he had been tried separately.

2. Severance

We next address whether the trial court erred when it refused to sever Russell's case from his co-defendants' cases. We hold that the trial court did not err.

As with Ramirez, the defenses were not antagonistic defenses and the cases were not so complex that it was impossible for the jury to separate the evidence as to each appellant. Russell does not assert, nor can we discern, any statements by Galeana Ramirez or Ramirez that implicated Russell. And, as previously discussed, the evidence against Russell was strong as to the first incident because he was identified and his cell phone was found at the scene. Evidence was also relatively strong as to the second incident because it tied Russell to Galeana Ramirez immediately before the second incident occurred.

Thus, Russell fails to establish that the trial court's refusal to sever Russell's case from Galeana Ramirez's and Ramirez's cases resulted in specific prejudice. Accordingly, the trial court did not err when it denied his motion to sever.

II. JURY UNANIMITY

Ramirez and Russell argue that they were denied their rights to a unanimous verdict related to their first degree robbery and attempted first degree robbery convictions because there was insufficient evidence that they were armed with a firearm or other deadly weapon. Galeana Ramirez and Russell argue that they were denied their rights to a unanimous verdict related to the

first degree assault of Leiva-Aldana because there was insufficient evidence of great bodily harm. These arguments fail.[8]

A. LEGAL PRINCIPLES

Alternative means statutes identify a single crime and provide more than one means of committing that crime. *State v. Williams*, 136 Wn. App. 486, 497, 150 P.3d 111 (2007). First degree robbery and first degree attempted robbery are alternative means crimes. *See In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 538, 309 P.3d 498 (2013). First degree assault is also an alternative means crime. *See* RCW 9A.36.011.

In Washington, criminal defendants have a constitutional right to a unanimous jury verdict. WASH. CONST. art. I, § 21; *State v. Woodlyn*, 188 Wn.2d 157, 162, 392 P.3d 1062 (2017). But if each alternative means is supported by sufficient evidence, "Washington defendants do not enjoy a recognized right to express unanimity." *Woodlyn*, 188 Wn.2d at 164. Thus, "'[i]n alternative means cases, where the criminal offense can be committed in more than one way, . . . an expression of jury unanimity is not required provided each alternative means presented to the jury is supported by sufficient evidence.'" *Woodlyn*, 188 Wn.2d at 164 (quoting *State v. Sandholm*, 184 Wn.2d 726, 732, 364 P.3d 87 (2015)). A general verdict will stand if we can rule out the possibility that the jury relied upon a charge unsupported by sufficient evidence. *Woodlyn*, 188 Wn.2d at 165. But if

---

[8] As a preliminary matter, the State argues that these issues were not preserved for appeal. Although RAP 2.5(a)(3) potentially precludes the appellants from raising their unanimity issues for the first time on appeal absent a showing of manifest constitutional error, we exercise our discretion to address their claims on the merits on appeal because the test for determining whether an alleged constitutional error is "manifest" is similar to the substantive issue. *State v. Knutz*, 161 Wn. App. 395, 407, 253 P.3d 437 (2011).

the evidence is insufficient to support any of the alternative means, "a particularized expression of jury unanimity is required." *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).

We review sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). Evidence is sufficient if, after viewing it in a light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt the elements of the crime proven. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265-66, 401 P.3d 19 (2017). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *Cardenas-Flores*, 189 Wn.2d at 265-66. Circumstantial evidence and direct evidence carry equal weight. *Cardenas-Flores*, 189 Wn.2d at 266. We defer to the jury to resolve issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

B. FIRST DEGREE ROBBERY AND ATTEMPTED FIRST DEGREE ROBBERY

Ramirez and Russell[9] argue that their rights to a unanimous verdict were violated with respect to their convictions for first degree robbery and attempted first degree robbery. They assert that (1) the to-convict instructions for the first degree robbery and attempted first degree robbery charges did not require the jury to be unanimous as to which of the alternative means the jury was relying on, (2) the State failed to elect which alternative means it was relying on, and (3) the

---

[9] Ramirez raises this argument in his briefing; Russell adopts this argument. Although Galeana Ramirez also joined in Russell's and Ramirez's arguments, Galeana Ramirez was not convicted of first degree robbery and attempted first degree robbery, so this argument is not relevant to his appeal.

evidence was insufficient to support the alternative means of having committed the crimes by displaying what appeared to be a firearm or other deadly weapon. We disagree.

The State charged both Ramirez and Russell with first degree robbery and attempted first degree robbery based on the October 24 incident and alleged that during the commission of each of these crimes they either (1) displayed what appeared to be a firearm or other deadly weapon, or (2) inflicted bodily injury. Neither Ramirez, Russell, nor the State dispute that the to-convict instructions allowed the jury to convict them based on these alternative means. Nor do Ramirez, Russell, or the State dispute that there was no unanimity instruction or that there was sufficient evidence to support their convictions based on the infliction of bodily injury alternative means. Thus, we must examine whether there was sufficient evidence to prove that Russell and Ramirez committed the robberies and the attempted robberies while armed with what appeared to be a firearm or other deadly weapon. We hold that there is sufficient evidence to support this alternative means.

At trial, Smith testified that Leiva-Aldana and Morales-Gamez were both saying "pistol" during the robbery and the attempted robbery. VRP (June 29, 2016) at 20. Morales-Gamez stated that he was hit in the head with something metal. Leiva-Aldana, however, gave conflicting testimony about whether or not he saw a firearm. On direct examination, Leiva-Aldana testified,

> Q: Did you see if they had anything in their hands while they were doing this?
> A: Yes. When they knocked down my–my buddy, I saw they had something like black, like a weapon.
> Q: You said it was like a weapon. What kind of a weapon was it like?
> A: Well, it just looked black. It was dark and you couldn't see really well.
> Q: Could you see if it was a knife or a gun?

26

> A: No.  It was like a type of-a arm (sic).
>
> Q: Okay.  Did they make any threats?
>
> A: Yes.  They hit my compadre on his head with it.

VRP (June 30, 2016) at 95-96.

On redirect examination, Leiva-Aldana confirmed that he had originally stated that he had

seen a gun:

> Q: Did you see a gun in the hands of any of the attackers the first time?
>
> A: I said yes.
>
> Q: And did you tell the police that you saw a gun in the hands of one of the attackers?
>
> A: Yes.

VRP (June 30, 2016) at 145-46.

On recross examination, however, Leiva-Aldana acknowledged that he could only say that

he saw something "dark."

> Q:  Mr. Leiva, on the 31st of October do you recall telling the police that, "when Agustin was being attacked I saw something in the white guy's hand, but I couldn't tell what it was"?
>
> A:  Yes.  But I saw it was something black and I was-told it was an arm (sic).
>
> Q:  So let's talk about that a little bit.  Okay.  So today you testified that-and the prosecutor said, did you see a gun, and you said yes?
>
> A:  Yes.  I saw like a weapon, like an arm (sic) in his hand and I assumed it was a-an arm (sic).
>
> Q:  Okay. Let's talk about that.  So I think you indicated it was dark out; is that correct?
>
> A:  Yes, of course.
>
> Q:  Okay.  Based on that statement that you've already admitted, it appears that you were not able to identify what it was; is that correct?
>
> A:  How?
>
> Q: Okay.  So 1 think you described as you saw something black; is that correct?

27

A:  Yes.

Q:  Okay.  And you talked to [Morales-Gamez] and he thought it was something and he told you what he thought what it was; is that correct?

A:  No.  He told me it was a-he-no, he told me it was an arm (sic).

Q:  Okay.

A:  And that is what they hit him on the head with.

Q:  Okay.  But you, based on what you saw, you can't say that you saw a-a firearm or a gun.  You can only say that you saw something dark; is that correct?

A:  That is true.

VRP (June 30, 2016) at 149-50.

Although Leiva-Aldana gave conflicting testimony, the State elicited testimony from him that he had seen what appeared to be a pistol and testimony from Smith that Leiva-Aldana and Morales-Gamez were saying "pistol" after the attack.  And Morales-Gamez said he was hit in the head with something metal.  Viewing this evidence and all reasonable inferences in a light most favorable to the State, we hold that there was sufficient evidence for a rational trier of fact to find that Russell and Ramirez displayed what appeared to be a firearm or other deadly weapon during the robbery and the attempted robbery.  Thus, their unanimity argument fails.

C.  FIRST DEGREE ASSAULT OF LEIVA-ALDANA

Next, Galeana Ramirez and Russell argue that their rights to unanimous verdicts on the first degree assaults related to Leiva-Aldana were violated because the State failed to present

28

sufficient evidence of the alternative means of great bodily harm. [10, 11] We disagree.

RCW 9A.04.110(4)(c) defines "great bodily harm" as "bodily harm means bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ." The trial court's instruction defining "great bodily harm" was consistent with the statutory definition. Ramirez CP at 76 (jury instruction 17).

By challenging the sufficiency of the evidence, Galeana Ramirez and Russell admit the truth of the State's evidence and all reasonable inferences. *Cardenas-Flores*, 189 Wn.2d at 265-66. The evidence presented proved that Leiva-Aldana was shot in the abdomen and that the bullet caused an entry and an exit wound. It is a logical inference that one being shot by a firearm in the abdomen is an injury that has a probability of death.

Considering the testimony that Leiva-Aldana was shot through the abdomen, and viewing the evidence and all reasonable inferences in the light most favorable to the State, we hold that a rational trier of fact could find that Leiva-Aldana suffered the infliction of great bodily harm beyond a reasonable doubt.

Accordingly, the unanimity arguments fail.

---

[10] The parties do not dispute that first degree assault is an alternative means crime or that there is sufficient evidence to support the first alternative means charged, that Galeana and Russell assaulted Leiva-Aldana with a firearm or other deadly weapon. *See* RCW 9A.36.011(1)(a).

[11] Russell adopts Galeana Ramirez's argument. Although Ramirez also adopts this argument, it does not apply to him because he was not charged with first degree assault of either victim.

III. ADMISSION OF DETECTIVE COX'S TESTIMONY ABOUT OBTAINING THE FIREARM

For the first time on appeal, Galeana Ramirez argues the trial court improperly allowed Detective Cox "to speculate that there was a connection between" Galeana Ramirez and the person from whom the detective recovered the gun that was sent for testing with the bullet recovered at the scene of the October 25 shooting.[12] Br. of Appellant Galeana Ramirez at 21-22. We hold that this argument was waived.

Although a specific objection will preserve the right to appellate review of the court's ruling on the objection, it does not preserve the opportunity to argue a different basis for exclusion for the first time on appeal. *State v. Korum*, 157 Wn.2d 614, 648, 141 P.3d 13 (2006). At trial, when Detective Cox testified about the firearm he retrieved from third parties and then sent to the crime lab along with the bullet that he had retrieved from the crime scene, defense counsel objected based on foundation and hearsay, not based on speculation. Galeana Ramirez does not argue any exception to RAP 2.5 applies. Because Galeana Ramirez fails to properly preserve the issue for appeal, we hold that this issue is waived and decline to further address the issue.

IV. INEFFECTIVE ASSISTANCE OF COUNSEL: OFFICER GREEN'S PROBABLE CAUSE TESTIMONY

Galeana Ramirez argues that defense counsel's failure to object to the arresting officer's testimony that implied that the officer believed that Galeana Ramirez was guilty and failure to

---

[12] It does not appear that this argument applies to Russell or Ramirez, although each adopted Galeana Ramirez's argument. To the extent Galeana Ramirez's argument applies to Russell or Ramirez, the argument is waived.

object to the evidence of probable cause as irrelevant and unfairly prejudicial amounted to ineffective assistance of counsel.[13] We disagree.

To demonstrate ineffective assistance of counsel, Galeana Ramirez must show both that (1) defense counsel's conduct was deficient and (2) the deficient performance resulted in prejudice. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Prejudice occurs where there is a reasonable probability that, but for the deficient performance, the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). We need "not address both prongs of the ineffective assistance test if the defendant's showing on one prong is insufficient." *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007). And we presume that "counsel is effective, and the defendant must show there was no legitimate strategic or tactical reason for counsel's action." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

During its direct examination, the State asked Officer Robert Green why the officers had been looking for Galeana Ramirez on the morning of the shooting. Over defense counsel's hearsay objection, Officer Green testified, "Daniel Galeana Ramirez was - we were advised that he had - we had probable cause for his arrest for the shooting." VRP (July 1, 2016) at 265. Galeana Ramirez asserts that defense counsel should have objected to this testimony as improper opinion of guilt testimony. But Officer Green did not testify that *he* believed there was probable cause to arrest Galeana Ramirez—he testified that he had been advised there was probable cause to arrest Galeana Ramirez. The officer's testimony was brief and gave context to the jury. Furthermore,

---

[13] Although Russell and Ramirez adopt this argument, it does not apply to them.

Galeana Ramirez does not cite to any authority holding that an officer's description of an arrest of a criminal defendant is an improper opinion on a defendant's guilt. Thus, because the testimony was not improper, Galeana Ramirez's argument that his counsel was ineffective for failing to challenge this testimony as improper opinion testimony fails.

Galeana Ramirez also argues that his counsel was ineffective for failing to argue that the evidence that Officer Green was informed that there was probable cause to arrest him was irrelevant and unfairly prejudiced under ER 401 and 402. Counsel's decision not to object to the brief mention of probable cause was a reasonable trial tactic to avoid drawing attention to the subject. Thus, we hold that counsel was not deficient and the claim of ineffective assistance of counsel fails.

## V. MERGER

Russell and Ramirez next argue that their convictions for fourth degree assault of Morales-Gamez should merge with their first degree robbery convictions because the fourth degree assault of Morales-Gamez elevated the degree of the robbery to first degree robbery. They also argue that their convictions for fourth degree assault of Leiva-Aldana should merge with their convictions for the attempted first degree robbery because the assault of Leiva-Aldana elevated the degree of the attempted robbery to attempted first degree robbery.[14] Because the fourth degree assaults did not elevate the degree of either the robbery or the attempted robbery charges, we disagree.

---

[14] Russell and Ramirez make this argument in their briefs. Although Galeana Ramirez adopts their arguments, Galeana Ramirez was not charged with robbery, attempted robbery, or fourth degree assault, so this argument does not apply to him.

No. 49245-8-II
(Cons. 49278-4-II, 49265-2-II)

A. LEGAL PRINCIPLES

The state and federal double jeopardy clauses prohibit the imposition of multiple punishments for the same offense. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004); U.S. CONST. amend. V; WASH. CONST. art. I, § 9. Double jeopardy involves questions of law that we review de novo. *State v. Freeman*, 153 Wn.2d 765, 770, 108 P.3d 753 (2005). "'The double jeopardy doctrine protects a criminal defendant from being (1) prosecuted a second time for the same offense after acquittal, (2) prosecuted a second time for the same offense after conviction, or (3) punished multiple times foe the same offense.'" *State v. Fuller*, 185 Wn.2d 30, 33-34, 367 P.3d 1057 (2016) (quoting *State v. Linton*, 156 wn.2d 777, 783, 132 P.3d 127 (2006)).

*Freeman* outlined a three-part inquiry to apply for double jeopardy claims. 153 Wn.2d at 771-73. First, we search for express or implicit legislative intent to punish the crimes separately. Second, if there is no clear statement of legislative intent, we may apply the same evidence *Blockburger*[15] test, which asks if the crimes are the same in law and in fact. Third, we may use the merger doctrine to discern legislative intent where the degree of one offense is elevated by conduct constituting a separate offense. *Freeman*, 153 Wn.2d at 771-73; *see State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008) (stating the inquiry is a "three-part test"). Russell and Ramirez do not argue the first or second prongs of the *Freeman* test. Thus, we analyze only the third prong, merger.

Merger claims may be raised for the first time on appeal. *See State v. Ralph*, 175 Wn. App. 814, 822-23, 308 P.3d 729 (2013). The merger doctrine is a rule of statutory construction that

---

[15] *Blockburger v. United States*, 284 U.S. 299, 304. 52 S. Ct. 180, 76 L. Ed. 306 (1932).

applies when the legislature has clearly indicated that to prove a particular degree of crime, the State must prove not only that a defendant committed the crime but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes. *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983). Under the merger doctrine, we presume "the legislature intended to punish both offenses through a greater sentence for the greater crime." *Freeman*, 153 Wn.2d at 773. "Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume that the legislature intended to punish both offenses through a greater sentence for the greater crime." *Freeman*, 153 Wn.2d at 772-73.

## B. MERGER: FOURTH DEGREE ASSAULT AND FIRST DEGREE ROBBERY CONVICTIONS

Russell and Ramirez argue that the fourth degree assaults of Morales-Gamez should merge with the first degree robbery convictions because the fourth degree assaults of Morales-Gamez elevated the robbery charges to first degree robbery. We disagree because the robbery charges were elevated to first degree robbery by either the infliction of bodily injury or by the display of what appeared to be a firearm or other deadly weapon, not by the fourth degree assault of Morales-Gamez.[16]

Russell and Ramirez rely on *State v. Zumwalt*, which was one of the cases addressed in *Freeman* and in *Kier*. But in those cases, the elevating factor was not a simple assault, as is the case here. In *Zumwalt*, the robbery was elevated to first degree robbery by the serious injuries

---

[16] We note that neither Russell nor Ramirez argue that their fourth degree assault convictions should merge with their first degree robbery convictions because the assaults were necessary to elevate the charge from theft to robbery.

inflicted on the victim during the second assault, which also elevated the assault to a second degree assault, not just the fact the defendant assaulted the victim. *Freeman*, 153 Wn.2d at 770, 778. Similarly, in *Kier*, the robbery was elevated to first degree robbery by the displaying or use of a deadly weapon, which also elevated the assault to a second degree assault, not just the fact that the defendant assaulted the victim. 164 Wn.2d at 806.

Here, the fourth degree assaults of Morales-Gamez did not include either of the factors that elevated the robberies to first degree robbery. Because the fourth degree assaults did not elevate the robberies to first degree robbery, Ramirez and Russell fail to show that the first degree robbery and fourth degree assault of Morales-Gamez convictions merge.

C. MERGER: FOURTH DEGREE ASSAULT AND ATTEMPTED FIRST DEGREE ROBBERY CONVICTIONS

Russell and Ramirez also argue that because the fourth degree assaults of Leiva-Aldana elevated the attempted robbery charges to first degree, their fourth degree assault and attempted robbery convictions merge. Again, we disagree.

First, as discussed in the previous section, as with the completed first degree robberies, the fourth degree assaults of Leiva-Aldana did not elevate the attempted robbery charges to attempted first degree robbery.[17] Second, proof of an attempted robbery requires only proof of intent to commit robbery and a substantial step toward carrying out that intent. RCW 9A.28.020(1). Here, the attempted robbery as charged was completed when Russell and Ramirez took a substantial step toward the commission of the crime of robbery. It was not necessary for the jury to find that

---

[17] Again, we note that neither Russell nor Ramirez argue that their fourth degree assault convictions should merge with their attempted first degree robbery convictions because the assaults were necessary to elevate the charge from attempted theft to attempted robbery.

Russell or Ramirez committed an assault in order to convict either of them of attempted first degree robbery. *Kier*, 164 Wn.2d at 807 (2008) (discussing *State v. Esparza*, 135 Wn. App. 54, 143 P.3d 612 (2006)); CP at 43. Thus, because the fourth degree assault was not required to prove attempted robbery, the fourth degree assault convictions do not merge with the attempted robbery convictions for Russell and Ramirez.

## VI. FIREARM ENHANCEMENTS NOTED ON RUSSELL'S JUDGMENT AND SENTENCE

Russell next argues that the sentencing court erred by noting in his judgment and sentence that he had used a firearm when he committed the first degree robbery (count I) and the attempted first degree robbery (count II) because the jury did not find that he was armed with a firearm when he committed these offenses.[18] We agree that his written judgment and sentence contains a scrivener's error in Section 2.1. Accordingly, we remand Russell's judgment and sentence to the trial court to correct the error.

The remedy for a scrivener's error is to remand to the trial court for correction. *In re Pers. Restraint of Mayer*, 128 Wn. App. 694, 701, 117 P.3d 353 (2005). Here, the jury found by special verdict that Russell was *not* armed with a firearm during the commission of the first degree robbery (count I) or the attempted first degree robbery (count II). Thus, the sentencing court erred by filling out section 2.1 of the judgment and sentence to indicate that the jury found that Russell used a firearm during the commission of these crimes.

---

[18] Although Galeana Ramirez and Ramirez join in Russell's arguments, this argument only pertains to Russell.

The sentencing court correctly noted the firearms enhancements for counts III and IV in section 2.3 and 4.1(a) in the judgment and sentence and thus, the length of Russell's sentence is not affected by the court's error in section 2.1. Therefore, we remand for correction of the scrivener's error in Russell's judgment and sentence.

## VII. SAG CLAIMS

In their SAGs, the appellants each claim that their right to a fair trial was violated because, prior to voir dire, they were brought by jail staff down a hallway where the jury pool could have potentially seen them and that the trial court erred when it denied the request to secure a different jury panel. This claim fails.

Before voir dire, Russell's counsel advised the trial court that the defendants had been brought to the courtroom through a hallway that passed a room used for the jurors and that it was possible the jurors had seen the defendants flanked by guards. Counsel requested that the proceedings start another day to avoid the risk that the potential jurors had seen the defendants, but counsel stated that he was not sure what the jurors saw. The trial court denied the request to start trial another day and advised Russell's counsel that he could explore this issue during voir dire. None of the appellants' counsels asked the potential jurors about this issue during voir dire.

Because none of the appellants' counsels asked the potential jurors about this incident during voir dire, there is nothing in the record demonstrating that any of the jurors saw the defendants in the hallway. And there is nothing in the record suggesting that any of the jurors were prejudiced by the incident. Because none of the defense counsels developed the record about what the potential jurors had actually observed, the trial court's initial decision to go forward was

not improper. Furthermore, because there is nothing in the record regarding what the potential jurors actually observed, we cannot determine if counsels' failure to question the potential jurors about the incident was prejudicial. *See State v. Ollison*, 68 Wn.2d 65, 69, 411 P.2d 419 (1966) (rejecting challenge to the trial court's denial of a motion for mistrial when the only evidence regarding whether potential jurors were prejudiced by possibly having seen the defendant in the hallway wearing handcuffs was defense counsel's statements). Accordingly, this claim fails.

### VIII. No Cumulative Error

Finally, the appellants argue that cumulative errors resulted in an unfair trial that violated their due process rights.[19] We disagree.

The cumulative error doctrine applies when a trial is affected by several errors that standing alone may not be sufficient to justify reversal but, when combined may deny a defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). To determine whether cumulative error requires reversal of a defendant's conviction, this court must consider whether the totality of circumstances substantially prejudiced the defendant. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, ___ Wn.2d ___, 427 P.3d 621 (2018). The cumulative error doctrine does not apply when there are no errors or where the errors are few and have little or no effect on the trial's outcome. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

Because no errors occurred, other than a scrivener's error in Russell's judgment and sentence, the cumulative error doctrine does not apply. Thus, this claim fails.

---

[19] Ramirez raises this issue in his brief. Russell and Galeana Ramirez adopt this argument.

CONCLUSION

We affirm the appellants' convictions, but we remand for the trial court to correct the scrivener's error in Russell's judgment and sentence.

SUTTON, J.

We concur:

MAXA, C.J.

LANESE, J.P.T.